## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Kaarin Nelson Schaffer, as Trustee for the
Next of Kin of GEORGE P. FLOYD, Jr.,
Deceased,

                Plaintiff,

        vs.

Derek Chauvin, in his individual capacity as
a Minneapolis police officer; Tou Thao, in his
individual capacity as a Minneapolis police officer;
Thomas Lane, in his individual capacity as a
Minneapolis police officer; J. Alexander Kueng,
in his individual capacity as a Minneapolis police
officer; and the City of Minneapolis.


                Defendants.

Case No.

**Complaint**

*Jury Trial Demanded Under
Fed. R. Civ. P. 38(b)*

---

For her Complaint, Plaintiff Kaarin Nelson Schaffer, as trustee for the next of kin of decedent George P. Floyd, Jr, by and through her attorneys, states and alleges as follows:

### Introduction

1.    This cause of action arises out of George Perry Floyd, Jr.'s May 25, 2020 death, occurring at approximately 8:00 p.m., at the 3700 block of South Chicago Avenue South in Minneapolis.

2.    This cause of action is for money damages brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of George Floyd's clearly

established rights as secured by the Fourth and Fourteenth Amendments to the United

States Constitution against (1) Defendants Derek Chauvin ("Chauvin"), Thomas Lane

("Lane"), J. Alexander Kueng ("Kueng"), and Tou Thao ("Thao")  in their respective

capacities as duly-certified law enforcement officers employed by the Minneapolis Police

Department  (collectively, the "Defendant Officers"), for their respective violations of

Mr. Floyd's right to be free from the use of excessive force; and (2) Defendant City of

Minneapolis ("Minneapolis" or the "City") for its unconstitutional policies, customs

and/or practices under *Monell* and its progeny.

## Jurisdiction and Venue

3.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §§

1331, 1343, and 42 U.S.C. §§ 1983, 1988.

4.      Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents,

events, and occurrences giving rise to this action occurred in the District of Minnesota.

Moreover, upon information and belief, all of the parties reside in this Judicial District.

## The Parties

5.      At all times relevant hereto and until the time of his death on May 25, 2020,

Plaintiff's decedent George Floyd was a citizen of the United States and the city of

Minneapolis, county of Hennepin, state of Minnesota.

6.      Plaintiff Kaarin Nelson Schaffer ("Schaffer") resides in Hennepin County,

Minnesota, and is an attorney duly licensed to practice before the State and Federal Courts

of Minnesota.  On July 6, 2020, Schaffer was appointed as trustee for George Floyd's next

of kin.  A true and correct copy of the Order appointing Schaffer as trustee is attached hereto as Exhibit A.

7.      Mr. Floyd is survived by next of kin including his children and siblings.

8.      Minneapolis is and was at all times material hereto a political subdivision of the State of Minnesota, organized and existing under and by virtue of the laws of Minnesota.

9.      The Minneapolis Police Department ("MPD") is and was at all times material hereto a Minneapolis agency, providing the vehicle through which the City fulfills its policing functions.

10.     Upon information and belief, Defendant Chauvin is and was at all times material hereto a citizen of the United States and the state of Minnesota.

11.     Chauvin was at all times material hereto employed by the MPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

12.     Upon information and belief, Defendant Thao is and was at all times material hereto a citizen of the United States and the state of Minnesota.

13.     Thao was at all times material hereto employed by the MPD as a duly appointed and sworn police officer, and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

14.     Upon information and belief, Defendant Thomas Lane is and was at all times material hereto a citizen of the United States and the state of Minnesota.

15.     Lane was at all times material hereto employed by the MPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

16.     Upon information and belief, Defendant J. Alexander Kueng is and was at all times material hereto a citizen of the United States and the state of Minnesota.

17.     Kueng was at all times material hereto employed by the MPD as a duly appointed and sworn police officer and was acting in his individual capacity and/or under color of state law, and within the scope of his employment.

### Factual Allegations

**A. George Floyd's Death**

18.     At approximately 8:00 p.m. on May 25, 2020, the Defendant Officers were dispatched to the Cup Foods corner store located at 3759 Chicago Avenue, Minneapolis, Minnesota in response to a call alleging that Mr. Floyd had engaged in potential fraud, a non-violent offense.

19.     Defendants Lane and Kueng were the first to arrive on the scene and observed Mr. Floyd seated inside a vehicle.

20.     Defendants Lane and Kueng placed Mr. Floyd under arrest and secured both of Mr. Floyd's hands in handcuffs behind his back without incident.

21.     Mr. Floyd did not physically resist arrest.

22.     Mr. Floyd was unarmed and did not at any point physically or verbally threaten the officers, nor did he attempt to flee.

23.     After he was securely handcuffed, Mr. Floyd remained calm and complied with each of the officers' commands as directed, including sitting down against a wall and walking with the officers across the street without incident.

24.     Defendants Chauvin and Thao arrived on the scene after Mr. Floyd had been secured in handcuffs and while he was calmly speaking with Defendants Lane and Kueng.

25.     None of the Defendant Officers had knowledge of any information to reasonably believe that Mr. Floyd was armed, violent, or potentially dangerous.

26.     Defendant Chauvin was a MPD Field Training Officer ("FTO") and Defendant Kueng was his trainee.

27.     Probationary officers are assigned to FTOs to supervise their actions in the field for a short period following their training.

28.     Per City of Minneapolis policy, probationary officers are not permitted to ask FTOs questions or ask FTOs for advice or guidance while being supervised by FTOs.

29.     Once across the street, Mr. Floyd expressed to Lane and Kueng that he was experiencing claustrophobia.

30.     Despite Mr. Floyd expressing claustrophobia and distress, Lane suggested to the other officers they employ the "maximal restraint technique"- a technique in which an arrestee is restrained in a prone position

31.     Without provocation or justification, the Defendant Officers took Mr. Floyd to the ground and placed him face down in the street, with the left side of his face pressed against the pavement.

32.     Defendants Lane and Kueng kneeled on Mr. Floyd's back and legs, putting their body weight onto Mr. Floyd and pinning him to the ground.

33.     Upon information and belief, Defendant Kueng twisted Mr. Floyd's arms to the side of his body and held them in this position.

34.     Defendant Chauvin drove his left knee into the back of Mr. Floyd's neck, supporting his body weight by Mr. Floyd's neck as Mr. Floyd's face pressed into the ground.

35.     Lane asked the others if they should raise Mr. Floyd's legs, and Chauvin responded that the position Mr. Floyd was in was "good."

36.     Chauvin, Lane, and Kueng kept Mr. Floyd in prone position with their body weight on top of him for nearly nine minutes.

37.     Defendant Thao stood just feet away from Mr. Floyd's head and from the other Defendant Officers.

38.     Mr. Floyd said to Defendant Officers "Tell my kids I love them- I'm dead."

39.     Mr. Floyd said to Defendant Officers "Please, please- I can't breathe! Please, man."

40.     Mr. Floyd groaned and cried.

41.     An onlooker stated to Defendant Officers "You got him down- let him breathe at least, man," as Mr. Floyd continued to state that he could not breathe.

42.     A Defendant Officer told Mr. Floyd to "relax."

43.     Chauvin asked Mr. Floyd "What do you want?" Mr. Floyd repeated that he could not breathe and asked Chauvin to get off of his neck.

44.    Mr. Floyd began to cry out for his mother and remarked "I'm through." Mr. Floyd remarked that his stomach hurt, his neck hurt, and that he needed some water, and repeated that he could not breathe.

45.    Defendant Chauvin responded that Mr. Floyd should stop talking.

46.    Mr. Floyd stated "They're gonna kill me, man."

47.    An onlooker stated to Defendant officers that Mr. Floyd's nose was bleeding and exhorted the officers to look at Mr. Floyd's nose.

48.    Defendant Officers did not check on Mr. Floyd after hearing that he was bleeding.

49.    Another onlooker noted "That's wrong, right there, to put your knee on his neck."

50.    Mr. Floyd again cried that he could not breathe.

51.    An onlooker stated to Defendant Officers that Mr. Floyd was not resisting arrest and asked the Defendant Officers to put Mr. Floyd in the police vehicle that was less than an arm's length from where Mr. Floyd was being forcefully held down.

52.    An onlooker repeated that Mr. Floyd's nose was bleeding and asked how long Defendant Chauvin planned to hold Mr. Floyd down.

53.    During this exchange, Mr. Floyd groaned "I cannot breathe.  I cannot breathe. He'll kill me. He'll kill me."

54.    Lane suggested to the other officers that Mr. Floyd be rolled onto his side, stating, "I am worried about excited delirium, or whatever."

55.     Lane admitted to investigators that Mr. Floyd was not resisting in any manner at this time.

56.     Chauvin replied, contrary to national law enforcement best practices, "That's why we have him on his stomach."

57.     No officer attempted to move from Mr. Floyd's body or roll him onto his side.

58.     Thao exclaimed "This is why you don't do drugs, kids!" to Mr. Floyd and to the concerned onlookers.

59.     Mr. Floyd was terrified, knew that he was dying, and cried for "Mama."

60.     One onlooker told the Defendant Officers that Defendant Chauvin was obstructing Mr. Floyd's breathing, to which Defendant Thao responded, "Okay."

61.     Defendant Chauvin then re-adjusted the position of his leg and knee to increase the amount of force and weight exerted by his knee on Mr. Floyd's neck.

62.     The onlooker repeated that Chauvin was stopping Mr. Floyd's breathing and that Mr. Floyd was not resisting.

63.     Mr. Floyd spoke his last words: "Please- I can't breathe."

64.     An onlooker told Defendant Officers that Mr. Floyd was no longer speaking, and repeated that Mr. Floyd's nose was bleeding.

65.     Approximately 30 seconds after the onlooker noted that Mr. Floyd had stopped speaking, Mr. Floyd lost consciousness completely; his eyes closed and face slackened, and he ceased moving completely.

66.     After holding Mr. Floyd in a prone position for approximately five minutes, and noticing that Mr. Floyd was not moving, Lane said "Want to roll him on his side?"

67.     Kueng checked Mr. Floyd's right wrist for a pulse and said, "I couldn't find one."

68.     Despite Lane and Kueng's statements, the Defendant Officers continued to maintain their positions.

69.     Several onlookers shouted that Defendant Officers should "look at [Mr. Floyd]," that Mr. Floyd's breathing was stopped, and that Defendant Chauvin needed to get off of Mr. Floyd's neck.

70.     In response, and without removing his knee from Mr. Floyd's neck, Defendant Chauvin removed a canister of mace from his belt and pointed it toward the onlookers, while Defendant Thao stepped forward toward the onlookers.

71.     Thao not only did not come to Mr. Floyd's aid, but he actively prevented bystanders from doing so.

72.     Onlookers continued to express concern to Defendant Officers, making statements including "He cannot breathe," "Look at him," "He's not responsive right now," "Does he have a pulse?" "Is he breathing right now?" and "He's handcuffed!"

73.     An onlooker approached Defendant Thao and urged him by name to check Mr. Floyd for a pulse, to which Defendant Thao responded "Don't do drugs, guys."

74.     Another onlooker identified herself as a healthcare professional of the City of Minneapolis Fire Department and asked that Defendant Officers check Mr. Floyd for a pulse; in response, Defendant Thao told her to "get on the sidewalk."

75.     Mr. Floyd was ultimately kept in a prone position with the weight of the officers on his neck and back for approximately eight minutes and forty-six seconds.

76.     Mr. Floyd was unconscious for approximately four of those minutes, yet the Defendant Officers not only did not help him, but continued to cause George's death and further extinguish any chance for Mr. Floyd's survival.

77.     Chauvin kept his knee on Mr. Floyd's neck for the entirety of those eight minutes and forty-six seconds.

78.     The entire time Mr. Floyd was kept in that prone position, he remained handcuffed, compliant, and within the complete physical control of the three officers kneeling on top of him.

79.     While Mr. Floyd was kept in the prone position, he never resisted or attempted to flee.

80.     The Defendant Officers could hear the statements made by each other, by Mr. Floyd, and by the onlookers while Mr. Floyd was kept in the prone position.

81.     Defendant Officers held Mr. Floyd in a neck restraint long after he stopped moving altogether.

82.     An ambulance arrived, and Mr. Floyd was placed in the ambulance; Mr. Floyd was immobile and his body was limp.

83.     Defendant Chauvin kept his knee on the neck of Mr. Floyd even after EMTs arrived and began to check for a pulse.

84.     Defendant Lane conceded to investigators that Mr. Floyd was not resisting at the time of his death and had been rendered unconscious during his restraint.

10

85.     At no time, did Defendant Officers Lane, Kueng, or Tao physically intervene in the use of a neck restraint exhibited by Defendant Chauvin.

**B. MPD Trains its Officers to Use Deadly Force in Non-Deadly Circumstances**

86.     MPD trained its officers that a "neck restraint" was an authorized form of non-deadly force, and that a "chokehold" was a form of deadly force capable of causing serious bodily injury and/or death.

87.     At all times material hereto, MPD defined a "neck restraint" as "[c]ompressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck)." MPD defined a "chokehold" as "applying direct pressure on a person's trachea or airway (front of the neck)."

88.     At all times material hereto, MPD trained its officers that a proper "neck restraint" required the officer to "[c]ompress veins. arteries, nerves & muscles of the neck."

89.     Serious bodily injury and/or death is reasonably likely to result from an officer "compress[ing] a person's veins, arteries, nerves & muscles of the neck," regardless of whether direct pressure is applied to the front or back of the neck.

90.     The use of a "neck restraint" as defined by MPD constitutes deadly force.

91.     The Fourth Amendment prohibits the use of deadly force in non-deadly circumstances which do not pose an immediate threat of serious bodily injury and/or death.

92.     At all times material hereto, MPD's written policies authorized the use of a deadly "neck restraint" in non-deadly circumstances posing no immediate threat of serious bodily injury or death.

93.     At all times material hereto, MPD trained its officers that use of a "neck restraint" was authorized non-deadly force which officers could use in non-deadly situations.

94.     It has long been known by the law enforcement community that the use of neck restraints on subjects can lead to death.

95.     However, from at least April 15, 2012 until June 8, 2020, Minneapolis Police Department Policy 5-311 defined a neck restraint as "non-deadly force" and did not warn it can cause death.

96.     By policy, the MPD permitted and condoned the use of both conscious and unconscious neck restraints by its officers from at least April 15, 2012 until June 8, 2020.

97.     At all times material hereto, MPD's written policies authorized the use of a "neck restraint" in non-deadly circumstances posing no immediate threat of serious bodily injury or death.

98.     The City of Minneapolis possessed data indicating that since 2012, neck restraints/holds were used by its police officers on 428 people at an average rate of about one a week.

99.     Of those 428 people, 14% who were subjected to a neck restraint/hold lost consciousness.

100.     Upon information and belief, MPD officers regularly used neck restraints on passively resisting arrestees despite not being permitted to do so under policy.

101.     Training offered by the City of Minneapolis in 2014 and received by Chauvin and Thao authorized and instructed on the use of neck restraints by officers, presented it to

officers as a "non-deadly force" option, and included instruction on how to employ neck restraints in order to most efficiently render subjects unconscious.

102.    Upon information and belief, all training offered by the City of Minneapolis on the use of neck restraints, including that provided to the Defendant Officers, presented neck restraints to officers as a "non-deadly force" option, and included instruction on how to employ neck restraints in order to most efficiently render subjects unconscious.

103.    Training offered by the City of Minneapolis to MPD officers, including the Defendant Officers, encouraged officers to "compress veins, arteries, nerves, and muscles of the neck" of arrestees.

104.    Training materials offered to officers in 2014, including Defendants Chauvin and Thao, depict an officer placing a knee on the neck of an arrestee who is handcuffed in a prone position.

105.    Since at least April 16, 2012, MPD policy has required that "[a]fter a neck restraint or choke hold has been used on a subject, sworn MPD employees shall keep them under close observation until they are released to medical or other law enforcement personnel."

106.    Since at least April 16, 2012, the MPD failed to provide its officers with proper policy guidance and training on how to properly observe and attend to the medical needs of arrestees subjected to neck restraints.

107.    At all times material hereto, MPD trained its officers that a "neck restraint" could be used in non-deadly situations despite the fact that it constituted deadly force as utilized by MPD.

### C. Prone Restraint Training by the MPD and the Death of David Smith

108.   It is well known throughout the law enforcement and medical communities that holding a subject in a position of prone restraint for prolonged periods of time can be deadly.

109.   Compressing an arrestee in a prone position with weight on their back and/or abdomen restricts their ability to breathe and can result in asphyxiation.

110.   Deaths caused by this form of asphyxiation are often interchangeably referred to as deaths from positional, mechanical, or compression asphyxia, even if technical distinctions exist.

111.   The United States Department of Justice has warned law enforcement for decades about the dangers of prone restraint and as early as 1995: "The risk of positional asphyxia is compounded when an individual with predisposing factors becomes involved in a violent struggle with an officer or officers, particularly when physical restraint includes behind-the-back handcuffing combined with placing the subject in a stomach-down position." National Law Enforcement Technology Center, *Positional Asphyxia—Sudden Death* at *2 (June 1995).

112.   These dangers were acknowledged in an October 18, 2012 deposition by then-MPD Chief Timothy Dolan in addition to many other high-ranking officers in the matter of *Smith v. Gorman*, Case No. 11-cv-3071 (SRN/JJK).

113.   Due to the well-known risks associated with prone restraint, it has long been national best practice that once a subject is controlled, it is imperative that they be moved from the prone position, and that their breathing be assessed.

14

114.   Minneapolis has had a policy in place addressing this issue since at least May 29, 2002:

> When **ANY** restraint technique is used on a subject, the subject shall not be left in a prone position and shall be placed on their side as soon as they are secured.  Once the subject is secured, an officer shall watch for any of the following signs:
>
> - Significant change in behavior or level consciousness;
>
> - Shortness of breath or irregular breathing;
>
> - Seizures or convulsions;
>
> - Complaints of serious pain or injury; and/or
>
> - Any other serious medical problem.

MPD Policy & Procedure Manual § 9-111.01 (emphasis in original).

115.   Despite this knowledge, as of 2012, officers were not provided official training on the dangers of positional or mechanical asphyxia associated with prone restraint.

116.   As of 2012, officers were trained that if a subject in a prone restraint is speaking, that they need not be concerned that the subject may be having difficulty breathing.

117.   Despite the well-known risk of death associated with placing a subject in prolonged prone restraint, particularly without properly monitoring their medical condition, Mr. Floyd was not the first black man to be killed by MPD officers under such circumstances.

118.    On September 9, 2010, veteran MPD Officers Timothy Gorman ("Gorman") and Timothy Callahan ("Callahan") responded to the Minneapolis YMCA, where David Smith ("Mr. Smith") was experiencing the effects of mental illness.

119.    Rather than use de-escalation techniques, Gorman and Callahan immediately went hands on with Mr. Smith and subjected him to five Taser deployments in addition to other force.

120.    Gorman and Callahan placed Mr. Smith a prone restraint position with his hands handcuffed behind his back.

121.    Despite Smith being handcuffed and adequately controlled, Mr. Smith was restrained in a prone position by Callahan and Gorman for at least 4 ½ minutes, with Gorman kneeling on Mr. Smith's back and Callahan straddling Mr. Smith's upper thigh/buttocks region.

122.    Despite the fact that Callahan and Gorman had Smith adequately controlled, they failed to monitor Mr. Smith's breathing or medical condition throughout their restraint of Mr. Smith.

123.    Rather than assist Mr. Smith, Callahan berated him, calling him a "mother fucker."

124.    It was 6 and ½ minutes before either Callahan or Gorman made any effort to check on Mr. Smith's medical condition.

125.    Mr. Smith was pulseless, breathless, and lifeless by the time Callahan and Gorman finally made the effort to observe Mr. Smith's medical condition.

126.    Paramedics were able to resuscitate Mr. Smith's heart, but he never regained consciousness and was removed from life support and officially died on September 17, 2010.

127.    Hennepin County Chief Medical Examiner Andrew Baker determined that the manner of death was homicide, and that the cause of death was anoxic encephalopathy due to or as a consequence of cardiopulmonary arrest due to or as a consequence of mechanical asphyxia.

128.    Callahan filmed the mechanical asphyxiation of Mr. Smith on a personal and non-departmentally issued "pen camera" that Callahan wore in his short pocket.

129.    Callahan and Gorman were both aware of the fact that Callahan filmed Mr. Smith's asphyxiation on the pen camera, yet the pen camera was intentionally concealed from MPD investigators on September 9, 2010.

130.    Callahan did not disclose the existence of the pen camera video of Mr. Smith's asphyxiation until nearly a week later on September 15, 2010, but was not disciplined for concealing evidence of a homicide.

131.    MPD pretended to conduct a homicide investigation into the acts of Callahan and Gorman but made no legitimate effort to investigate the actions of the officers.

132.    The Grand Jury no-billed Gorman and Callahan due to the complete and utter lack of investigation conducted by the MPD as to Gorman and Callahan's conduct.

133.    The MPD Internal Affairs Unit then conducted no legitimate investigation into Gorman and Callahan's conduct, also concluding that the officers did nothing

actionably wrong—including the hiding of evidence (i.e., the pen camera) from investigators.

134.    The MPD failed to take any disciplinary or other remedial action towards Callahan and Gorman despite the fact that multiple high-ranking officials within the MPD observed obvious constitutional or policy violations by officers Gorman and Callahan.

135.    The City of Minneapolis ultimately approved a substantial settlement to the family of David Smith to resolve that litigation, one of the highest amounts it had ever paid.

136.    As part of that settlement, the City of Minneapolis "agreed to require its sworn police officers to undergo training on positional asphyxia in the 2014 training cycle of the Minneapolis Police Department…"

137.    Despite publicly stating an intent to properly instruct its officers on the risks of asphyxiation during arrest, internally the MPD continued to minimize that risk and promote a false narrative that deaths like David Smith were the result of "excited delirium" instead of asphyxiation.

138.    Upon information and belief, the City of Minneapolis did not comply with the terms and/or the spirit of its 2013 Settlement Agreement with the family of Mr. Smith with respect to training on positional asphyxia.

139.    Upon information and belief, the City of Minneapolis routinely trains officers to place handcuffed arrestees in a prone position without proper training on putting arrestees in a recovery position and monitoring their breathing and consciousness.

140.   The impact of the excited delirium false narrative and the MPD's failure to properly train on asphyxiation risks is highlighted here by Lane's statement: "I am worried about excited delirium, or whatever."

141.   When holding a subject in a prone position, well-trained officers in Minneapolis should not be concerned about "excited delirium, or whatever."  Officers in Minneapolis should know the risks of asphyxiation associated with prone restraint.

142.   High-ranking MPD personnel have continued to publicly maintain other deadly false narratives.

143.   MPD Lieutenant and agent of the City of Minneapolis Bob Kroll- who has served as the president of the Police Officers Federation of Minneapolis since 2015 and has sat on its board since 1996- has publicly expressed the opinion that Eric Garner, a Black man asphyxiated by the New York Police Department in 2014- could breathe at the time of his death because he was able to state "I can't breathe" several times as he was dying.

144.   It is an accepted scientific fact that the ability to speak does not imply that someone is getting sufficient air to survive.

**D. The MPD's History Providing and Permitting Killology Training**

145.   Up and until 2019, the City of Minneapolis permitted officers to receive "Killology" or "warrior style" training, which teaches officers to consider every person and every situation as a potential deadly threat and to kill "less hesitantly."

146.   The City of Minneapolis was aware prior to the death of George Floyd that the officer who shot and killed Philando Castile in the nearby suburb of Falcon Heights had received Killology training.

147.    Upon information and belief, a significant proportion of police officers employed by the MPD in May of 2020 had received Killology training during their employment.

148.    High-ranking officers and agents of the MPD, including Kroll, encouraged all officers to receive warrior-style police training.

149.    High-ranking officers and agents of the MPD, including Kroll, offered this training free of charge to all officers of the MPD who wanted to receive it.

150.    The City of Minneapolis was aware that its officers had received and continued to receive Killology training before and through May of 2020, but did nothing to prevent officers from receiving it or re-training officers who had received it.

151.    Kroll has further encouraged officers to behave aggressively, stating that MPD officers who do not receive citizen complaints are "low-level slugs" who "[don't] get out and investigate anything. And that's not what we're paying our officers to do."

152.    Kroll has stated that policing should be viewed like "a basketball game, in that if you're not getting any fouls, you aren't playing hard enough."

153.    The City of Minneapolis and high-ranking members of the MPD are aware that Kroll is an influencer for rank-and-file officers, and that its officers follow his lead with regard to law enforcement beliefs and behaviors.

154.    Upon information and belief, Defendant City of Minneapolis has control over the amount of influence the Minneapolis Police Federation has over the officers, discipline, training, decision-making, and policy decisions of the Minneapolis Police Department.

155.   The Minneapolis Mayor and City Council are responsible for negotiations with the Minneapolis Police Federation, including matters of officer discipline and retention. The Minneapolis Police Department Chief of Police is responsible for all decisions of hiring.

156.   The Minneapolis Police Federation membership is made up of employees, agents, and officers of the Minneapolis Police Department.

157.   The Police Officers within the Minneapolis Police Federation continue to be employees of the Minneapolis Police Department subject to the policies, training and orders.

158.   The Minneapolis Police Department is responsible for maintaining training and discipline to ensure its officers follow its policies, orders, and training regardless of the opinions and actions of the Minneapolis Police Federation.

## E. The City of Minneapolis and the MPD's Failure to Terminate Dangerous Officers

159.   The City of Minneapolis frequently fails to terminate or discipline officers who demonstrate patterns of misconduct.

160.   Upon information and belief, Chauvin was the subject of 17 citizen complaints from 2006 to 2015, only one of which resulted in discipline, in the form of a letter of reprimand.

161.   Upon information and belief, Chauvin has participated in the shooting and killing of at least three different individuals, including Wayne Reyes, Ira Latrell Toles, and Leroy Martinez.

162.   In 2005, Defendant Chauvin engaged in a reckless police chase resulting in the deaths of three individuals but was not discharged from the Minneapolis Police Department.

163.   Upon information and belief, the MPD has observed unlawful or otherwise improper conduct by Chauvin throughout his career but has tolerated it and refused to remedy or mitigate it.

164.   Chauvin was precisely the type of reckless and dangerous officer that Kroll and other leaders of the Minneapolis Police Department encouraged him to be.

165.   Upon information and belief, Thao was the subject of six citizen complaints from 2013 to 2017, none of which have resulted in discipline.

166.   In 2017, Thao was the subject of a lawsuit for his use of excessive force, which the City of Minneapolis paid money to settle on his behalf.

167.   Upon information and belief, the MPD has observed unlawful or otherwise improper conduct by Thao throughout his career but has tolerated it and refused to remedy or mitigate it.

168.   The MPD has engaged for years in contract negotiations with the Minneapolis Federation of Police which make it more difficult for the MPD to terminate officers who have demonstrated repeated misconduct.

**F.  The MPD's History of Overlooking Racially Biased Policing**

169.   Upon information and belief, Black community members make up 19% of the population of Minneapolis and 58% of the subjects of police force.

170.   The Minneapolis Police Department is currently being investigated for unlawful race-based policing, which deprives people of color, particularly Black community members, of their civil rights under the Minnesota Human Rights Act.

171.   Prior to 2007, African American members of the MPD, including now-Chief Arradondo, received hate letters signed from the Ku Klux Klan in their interoffice mail, accessible only to MPD agents and employees.

172.   Kroll has been accused by fellow officers, including now-Chief Arradondo, of publicly wearing a jacket with a patch depicting a racist "white power" logo.

173.   In recent years, Kroll, as president of the Minneapolis Police Federation, has publicly referred to the Black Lives Matter movement as a "terrorist organization."

174.   The Minneapolis Police Department ratified the culture of systemic racism and disparate treatment of the Black Community, by failing to remove or otherwise discipline Lt. Bob Kroll.

175.   By 2018, as the result of a settlement, the Minneapolis Police Department was required to conduct racial sensitivity training which, upon information and belief, has not yet been completed.

G. **The City of Minneapolis's Notice of Prior Incidents of Excessive Force**

176.   The City had notice of a 2009 incident wherein MPD officers used excessive force against Ira Alexander Stafford for which Mr. Stafford filed suit against the City in 2010, alleging that while he was lying on the ground, face down with his arms around him, "at least one officer had a knee in Stafford's back, making him effectively helpless."

(Compl.) *Stafford v. City of Minneapolis, et al,* Civil Action No. 0:10-cv-03149-MJD-TNL (D. Minn. 2010).

177.    According to media sources, the City entered into a monetary settlement with Zach King for a 2012 incident wherein MPD officers violated the Fourth Amendment and used excessive force against Mr. King by beating him and pressing a knee on Mr. King such that he could not breathe "almost like George Floyd." Mr. King was hospitalized with a concussion and multiple visible physical injuries as a result of the police beating. The City took no disciplinary action against the officers for their use of excessive force against Mr. King. https://www.cbsnews.com/news/minneapolis-officers-cited-in-misconduct-lawsuits-face-little-discipline/.

178.    The City had notice of a 2014 incident wherein MPD officers used excessive force against Alfred Flowers after he had been fully secured in handcuffs and not physically resisting. Mr. Flowers filed suit against the City and alleged that an officer suddenly grabbed him by his throat, choked him, and threw him to the ground and handcuffed him. After handcuffing Mr. Flowers, an MPD officer punched him in the head, following which several other officers entered the room and proceeded to kick and stomp on Mr. Flowers while he was handcuffed and laying on the ground. *Flowers v. City of Minneapolis*, *et al,* Civil Action No. 0:15-cv-03015-RHK-HB.

179.    The City had notice of a 2014 incident wherein MPD officers used excessive force against Lamar Allen Ferguson after he had been fully secured in handcuffs and not physically resisting. Mr. Ferguson filed suit against the City in April 2017 and alleges that two MPD Officers threw him to the ground after he had been handcuffed and began

punching him, following which MPD Officer Thao, a defendant in this action, lifted Mr. Ferguson's head off of the ground and kicked him directly in his mouth. *Ferguson v. City of Minneapolis, et al*, Civil Action No. 0:17-cv-01110-PJS-TNL (D. Minn. 2017).

180.    The City had notice of a 2016 incident wherein MPD officers used excessive and unjustified force against Abdi Hussen Hagad, a black male. MPD officers approached Mr. Hagad and violently threw him against a brick wall and dislocated his shoulder despite the absence of physical resistance from Mr. Hagad. *Wagad v. City of Minneapolis, et al*, Civil Action No. 0:17-cv-05239-MJD-TNL (D. Minn. 2017).

181.    The City had notice of a 2016 incident wherein MPD officers used excessive force against Tomas Garcia-Orihuela during the course of an arrest. Mr. Garcia-Orihuela filed suit against the City and alleged that after he was handcuffed on the ground, "several police officers began to kick and hit him" and continued to do so for several minutes while he was handcuffed and laying on the ground. *Garcia-Orihuela v. City of Minneapolis, et al*, Civil Action No. 0:17-cv-00292-RHK-KMM (D. Minn. 2017).

182.    The City had notice of a 2018 incident wherein multiple MPD officers used excessive and entirely unjustified force against Jeremiah Jermaine Thomas when an officer drop-kicked Mr. Thomas in the chest area following which three other MPD officers joined in and immediately started punching, kneeing, and kicking. Mr. Thomas suffered a punctured lung, internal bleeding, fractured ribs, and various scratches and bruises as a result of MPD's use of excessive force, and the City thereafter entered into a monetary settlement to resolve his claims. *Jeremiah Jermaine Thomas v. City of Minneapolis, et al.*, 0:19-cv-00954-WMW-DTS (D. Minn 2019).

183.    The City had notice of a 2013 incident wherein MPD officers used excessive and unjustified force against Catrina Johnson, a disabled woman who used a cane, by throwing her against her living room wall and onto the floor while using racial slurs. While Ms. Johnson was pinned to the ground face down, an MPD officer put his knee on the back of her head and applied direct pressure thereby causing injury. The City entered into a monetary settlement with Ms. Johnson to settle her claims. *Catrina Johnson v. City of Minneapolis, et al.*, 0:15-cv-02861-JRT-SER (D. Minn 2015).

184.    The City had notice of a 2018 incident wherein multiple MPD officers used excessive and entirely unjustified force against Rico McKinnies during the course of a traffic stop, after he was handcuffed and not resisting arrest. The City entered into a monetary settlement with Mr. McKinnies for the injuries he sustained therein. *Rico McKinnies v. City of Minneapolis*, et al., 0:18-cv-02738-NEB-BRT (D. Minn 2018).

185.    Each of the above-referenced incidents involved more than one officer at the scene and in each of those incidents, the non-participating MPD officers failed to intervene in the unconstitutional use of force against handcuffed, non-resisting citizens.

186.    In addition to a substantial settlement with the family of David Smith, the City of Minneapolis has been forced to pay significant sums of money for the unlawful deaths caused by its officers.

187.    In 2019, the City of Minneapolis approved a significant settlement with the family of Justine Ruszczyk, who was shot and killed by a Minneapolis Police Officer.

188.    In 2019, the City of Minneapolis approved a significant settlement the family of Jamar Clark, who was shot and killed by a Minneapolis Police Officer.

189.    In 2020, the City of Minneapolis approved a significant settlement with   the family of Terrance Franklin, who was shot and killed by a Minneapolis Police Officer.

190.    While the settlement of the Justine Ruszczyk was locally billed as transformational, it had no meaningful impact on how the MPD conducts its business.

191.    The Mayor and City Council receive notice of each lawsuit filed against the City.

192.    All monetary settlements made by the City must be approved by the Mayor and City Council.

193.    MPD's Policy Manual requires that the Chief of Police report to the Mayor each instance of officer misconduct and in accordance with the same, the Chief of Police reported to the Mayor each instance of officer misconduct.

### Count I– 42 U.S.C. §1983 – Fourth Amendment Violations
*Plaintiff v. Chauvin, Thao, Lane, and Kueng, Individually and in Their Official Capacities*

194.    Plaintiff incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

195.    The conduct by the officers identified in this count and described herein constituted excessive and deadly force in violation of the Fourth Amendment of the United States Constitution, , and clearly established law.

196.    At all material times, Defendants Chauvin, Lane, and Kueng were each acting under color of state law, as agents of Minneapolis, and within the scope of their employment and authority as duly-certified law enforcement officers of the City of Minneapolis.

197.   At all times material hereto, Defendant Chauvin was acting in a supervisory capacity as a Field Training Officer and directly participated in violating Mr. Floyd's federal rights. Defendant Chauvin is therefore liable in both his individual and supervisory capacities.

198.   At all material times, Chauvin, Lane and Kueng had no reason to believe that Mr. Floyd was armed or dangerous.

199.   At all material times, Chauvin did not have a reasonable fear of imminent bodily harm when he kneeled on Mr. Floyd's neck, nor did Chauvin have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Floyd.

200.   At all material times, Lane and Kueng did not have a reasonable fear of imminent bodily harm when they kneeled on Mr. Floyd's back, nor did they have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Floyd.

201.   Every reasonable officer would have known that using force against a compliant, handcuffed individual who is not resisting arrest constitutes excessive force in violation of the Fourth Amendment.

202.   Chauvin's use of deadly force in applying direct pressure to and kneeling on Mr. Floyd's neck was objectively unreasonable and violated clearly established law.

203.   Lane and Kueng's use of force in applying direct pressure to and  kneeling on Mr. Floyd's back was objectively unreasonable and violated clearly established law.

204.   It was objectively unreasonable for Chauvin, Lane, and Kueng to maintain Mr. Floyd in a prone position without properly monitoring his breathing or pulse.

205.    It was a violation of Mr. Floyd's Fourth and Fourteenth Amendment rights for Chauvin, Lane, Kueng, and Thao not to render medical aid following Mr. Floyd's complaints that he could not breathe and Mr. Floyd's loss of consciousness, each of which demonstrated a serious medical need.

206.    As a result of Chauvin, Lane, and Kueng's unjustified, excessive, and illegal, and deadly use of force, Mr. Floyd experienced conscious pain and suffering.

207.    As a result of Chauvin, Lane, and Kueng's unjustified, excessive, illegal, and deadly use of force, Mr. Floyd died.

208.    In addition to these uses of unjustified, excessive, illegal, and deadly uses of force, each of the Defendant Officers had a duty to intervene on behalf of a citizen whose constitutional rights were being violated in their presence by another officer.

209.    Thao, Lane, and Kueng all recognized that the force being used, including but not limited to Chauvin kneeling on Mr. Floyd's neck, was excessive and unreasonable under the circumstances.

210.    Defendants Lane, Kueng, and Thao each observed and were in a position to intervene to stop Defendant Chauvin's use of constitutionally unreasonable deadly force against Mr. Floyd.

211.    None of the Defendant Officers **ever** had a reasonable fear of imminent bodily harm, nor did they have a reasonable belief that any other person was in danger of imminent bodily danger from Mr. Floyd **at any point in time.**

212.   Defendants Lane and Kueng's failure to intervene in Defendant Chauvin's use of constitutionally unreasonable deadly force violated Mr. Floyd's clearly established Fourth Amendment rights.

213.   Defendant Thao's failure to intervene in the other Defendant Officers' use of constitutionally unreasonable force violated Mr. Floyd's clearly established Fourth Amendment rights.

214.   As a result of the failure to intervene by Thao, Lane, and Kueng, Mr. Floyd experienced conscious pain and suffering.

215.   As a result of Thao, Lane, and Kueng's unjustified failure to intervene in the excessive use of force, Mr. Floyd died.

216.   As a direct and proximate result of the acts and omissions described herein, Mr. Floyd suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

217.   Punitive damages are available against Chauvin and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. Ann. § 549.20.

218.   Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

219.   The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

220.   As a direct and proximate result of these wrongful acts and omissions, George's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

### Count II – 42 U.S.C. §1983 – *Monell Liability*
*Plaintiff v City of Minneapolis*

221.   Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

222.   MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the city." (MPD Policy Manual Sec. 1-301 (citing City Charter reference-Chapter 6, Section 1)).

223.   The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies and training programs governing the conduct of MPD officers performing policing functions on behalf of the City.

224.   The Mayor, the City Council, and the Police Chief established and/or approved of MPD's written policies and training governing the conduct of MPD officers performing policing functions.

225.    The written policies and training established and/or approved by The Mayor, the City Council, and the Police Chief constitute the official policy of the City and were the moving force behind and caused Plaintiff's injuries.

226.    The City, acting by and through its Mayor and/or other policymakers, had knowledge of MPD's unconstitutional patterns and practices and knowledge that the same gave rise to a risk of violations of citizens' federal rights.

227.    The City, acting by and through its Mayor and/or other policymakers, made a deliberate and/or conscious decision to disregard the known risk of harm that would result from MPD's unconstitutional patterns and practices and was deliberately indifferent to and/or tacitly authorized the same.

228.    On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the handcuffing and restraint process.

229.    On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by MPD officers.

230.    On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered or ratified a number of customs, patterns, or practices that condoned and required

officers to treat the members of the Black Community of Minneapolis differently, including but not limited to implementing deadly force at a higher rate against Black men who did not pose a threat to officers.

231.     On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

232.     Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employee Chauvin and Thao despite knowledge of their repeated unconstitutional, unlawful, or other improper conduct.

233.     Minneapolis had to the power to terminate or appropriately discipline Chauvin and Thao for their misconduct prior to May 25, 2020, but failed to do so despite the City's knowledge of a pattern of complaints regarding excessive force.

234.     By refusing to terminate Chauvin or Thao, Minneapolis caused Chauvin and Thao to act with impunity and without fear of retribution.

235.     Minneapolis' failure to terminate or properly discipline Chauvin or Thao is part of its larger custom, police, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Chauvin, Thao, and the other Defendant Officers to continue engaging in unlawful acts towards arrestees, including George.

236.     On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted,

or ratified its agents, including Lt. Bob Kroll, providing improper and harmful training to officers.

237.    Minneapolis had to the power to terminate or appropriately discipline Kroll prior to May 25, 2020, but failed to do so despite the City's knowledge of Kroll's perpetuation of dangerous ideology to officers.

238.    By refusing to terminate or discipline Kroll or denounce his ideology, Minneapolis caused officers act with impunity and without fear of retribution.

239.    On or prior to May 25, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, participated in contract negotiations with the Police Officers Federation of Minneapolis that granted officers powers that allowed them to avoid discipline for misconduct, including but not limited to:

       a.    A grievance process that resulted in a nearly 50% rate of overturns of terminations of officers;

       b.    The ability to review evidence and video footage prior to giving statements in use of force and misconduct matters.

240.    This participation by the City of Minneapolis caused officers to act with impunity and without fear of retribution.

241.    The unconstitutional policies, practices, and customs defined herein were the moving force behind George's death.

242.    George died as a direct and proximate result of the acts and omissions by Minneapolis.

243.    As a direct and proximate result of the acts and omissions described herein, George suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

244.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

245.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

246.    As a direct and proximate result of these wrongful acts and omissions, George's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

### Count III – 42 U.S.C. §1983 – *Canton Liability*
*Plaintiff v. City of Minneapolis*

247.    Plaintiff hereby incorporates and re-alleges all preceding paragraphs as though fully pleaded herein.

248.    Minneapolis failed to properly train or modify its training to Defendant Officers and its other officers, including but not limited to, matters related to the reasonable and appropriate use of force during such arrests, and intervention in the excessive use of force by fellow officers.

249.    Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which Minneapolis law enforcement officers and other agents encounter on a regular basis.

250.    As such, Minneapolis was aware of a need for more and different training. Minneapolis specifically knew that its officers needed training regarding the use of prone restraint and was required to provide its officers with such training.

251.    Minneapolis also specifically knew that its officers needed specific training on the use of neck restraints.

252.    With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers on the use of prone and neck restraint.

253.    Minneapolis was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

254.    As such, Minneapolis was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

255.    The failure to train and/or to appropriately modify training constituted official Minneapolis policies, practices, or customs.

256.    Minneapolis's failure to train and/or to modify training was behind the acts and omissions the Defendant Officers made toward Mr. Floyd.

257.    As a direct and proximate result of Minneapolis's acts and omissions, Mr. Floyd suffered injuries, experienced pain and suffering, and ultimately died.

258.    As a direct and proximate result of the acts and omissions described herein, Mr. Floyd suffered compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

259.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

260.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute Section 573.02, subdivision 1.

261.    As a direct and proximate result of these wrongful acts and omissions, Mr. Floyd's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**PLAINTIFF DEMANDS A JURY TRIAL AS TO ALL ISSUES OF FACT HEREIN.**

### Prayer for Relief

WHEREFORE, Plaintiff Kaarin Nelson Schaffer, as Trustee for the next of kin of George P. Floyd, Jr., prays for judgment against Defendants as follows:

1.      As to Count I, a money judgment against Defendants Chauvin, Thao, Lane, and Kueng for compensatory, special, and punitive damages and punitive damages together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

2.      As to Count II, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest.

3.      As to Count III, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with costs

and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and

prejudgment interest.

      4.     For the appointment of a receiver or similar authority to ensure that the City

of Minneapolis properly trains and supervises

      5.     For such other and further relief as this Court deems just and equitable.

            **NEWMARK STORMS DWORAK LLC**

Dated: July 15, 2020          /s/ Jeffrey S. Storms _____
                 Jeffrey S. Storms (#0387240)
                 150 South 5th Street, Suite 1850
                 Minneapolis, MN 55402
                 Telephone:  (612) 455-7050
                 Facsimile:  (612) 455-7051
                 E-mail: jeff@newmarkstorms.com

            *- and -*

            **BEN CRUMP LAW**
            Ben Crump (*pro hac vice pending*)
            (Washington, D.C. Bar No. 1552623)
            717 D Street N.W., Suite 310
            Washington, D.C. 20004
            E-mail: ben@bencrump.com

            *- and -*

            **ROMANUCCI & BLANDIN, LLC**
            Antonio M. Romanucci (*pro hac vice pending)*
            (Illinois ARDC No. 6190290)
            Bhavani Raveendran (*pro hac vice pending*)
            (Illinois ARDC No. 6309968)
            Nicolette A. Ward (*pro hac vice pending*)
            (Illinois ARDC No. 6324818)
            321 North Clark St., Suite 900
            Chicago, Illinois 60654
            Tel: (312) 458-1000
            Fax: (312) 458-1004
            E-mail: aromanucci@rblaw.net

E-mail: b.raveendran@rblaw.net
E-mail: nward@rblaw.net

*- and -*

**PINTAS AND MULLINS LAW FIRM**
William Pintas (*pro hac vice pending*)
Laura Mullins (*pro hac vice pending*)
368 W. Huron Street, #100
Chicago, IL 60654
Ph: (800) 841-3268
E-mail: bill@pintas.com
E-mail:  laura@pintas.com

*- and -*

**JACOB LITIGATION, INC.**
Devon M. Jacob (*pro hac vice pending*)
P.O. Box 837
Mechanicsburg, PA 17055-0837
Tel: (717) 796-7733
E-mail: djacob@jacoblitigation.com

*- and -*

**STEWART TRIAL ATTORNEYS**
Chris Stewart (*pro hac vice pending*)
Justin Miller (*pro hac vice pending*)
55 Ivan Allen Jr. Blvd Suite 700
Atlanta, GA 30308
Tel: (844) 874-2500
E-mail: cstewart@stewarttrial.com
E-mail: jmiller@stewarttrial.com

*- and -*

**LEWIS BRISBOIS BISGAARD & SMITH, LLP**
Michelle R. Gilboe (#260411)
Scott Masterson (*pro hac vice pending*)
90 7th Street, Suite 2800
Minneapolis, MN 55402
Tel: (612) 428-5000
Fax: (612) 428-5001
E-mail: michelle.gilboe@lewisbrisbois.com
E-Mail: scott.masterson@lewisbrisbois.com

*Attorneys for Kaarin Nelson Schaffer, as Trustee for the Next of Kin of George P. Floyd, Jr., Deceased*